# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

David M. Kedrowski,

       Plaintiff,

v.

Elizabeth Richards, Loretta Frederick,
Liberty Aldrich, Violence Free Minnesota,
Battered Women's Justice Project, and The
New York Fund, in their individual
capacities,

       Defendants.

Case No. 20-cv-0193 (ECT/DTS)

**OPINION AND ORDER**

---

David M. Kedrowski, *pro se*.

Steven J. Erffmeyer, Arthur, Chapman, Kettering, Smetak & Pikala, PA, Minneapolis, MN, for Defendants Elizabeth Richards and Violence Free Minnesota.

Uzodima F. Aba-Onu, Bassford Remele, Minneapolis, MN, for Defendants Loretta Frederick and Battered Women's Justice Project.

Gina K. Janeiro and Jessica M. Marsh, Jackson Lewis P.C., Minneapolis, MN, for Defendants Liberty Aldrich and The New York Fund.

---

In this case brought under 42 U.S.C. §§ 1983 and 1985(3), *pro se* Plaintiff David

M. Kedrowski alleges that Defendants—private individuals and organizations who

advocate on behalf of domestic-abuse victims—corrupted the impartiality of Minnesota's

Fourth Judicial District through their participation in grants awarded by the United States

Department of Justice, Office of Violence Against Women.  Kedrowski alleges that

Defendants undertook their advocacy in concert with Fourth Judicial District officials and

caused the legal process in his marital-dissolution case to be biased against him, violating his rights to procedural and substantive due process and equal protection. For each of eight counts, Kedrowski seeks compensatory and punitive damages "in an amount more than $20,000,000," among other relief. Compl. at 45 [ECF No. 1]. Defendants have moved to dismiss the suit for lack of subject-matter jurisdiction, arguing that Kedrowski's claims are barred by the *Rooker-Feldman* doctrine. Alternatively, Defendants Liberty Aldrich and The New York Fund have moved to dismiss for lack of personal jurisdiction. If their jurisdictional challenges are rejected, then Defendants seek dismissal of the Complaint for failure to state a claim upon which relief can be granted. The case will be dismissed. Though there is subject-matter jurisdiction over the case and personal jurisdiction over Aldrich and The New York Fund, Kedrowski fails to plead plausible claims.

I[1]

The best place to start is the factual allegations underlying Kedrowski's claims. Defendants "are pro-female domestic abuse victim advocates who purposefully infiltrated into the operations of the Minnesota Fourth Judicial District . . . from 2014 to 2018." Compl. ¶ 1. Defendants' activities occurred under grants awarded, funded, and administered by the United States Department of Justice, Office on Violence Against Women. *Id.* ¶ 4. Defendants worked with judges and others sympathetic to Defendants' missions to "select[], implement[], and administer Court policies and processes that

---

[1]    In describing the relevant facts and resolving this motion under Rule 12(b)(6), all factual allegations in the complaint are accepted as true, and all reasonable inferences are drawn in Kedrowski's favor. *See Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014).

delivered both favorable litigation outcomes for women alleging to be victims of domestic abuse and unfavorable litigation outcomes for men accused of domestic abuse." *Id.* ¶ 1. Defendants intended their activities to "attack[] and destroy[] the independence, fairness and impartiality" of Minnesota's Fourth Judicial District. *Id.* Kedrowski suffered injuries and "damages in an amount more than $20,000,000," stemming from the effects of Defendants' activities on the litigation of Kedrowski's marital-dissolution action in that court during 2015 to 2018. *Id.* ¶¶ 2, 250; *see also id.* ¶¶ 259, 268, 273, 279, 285, 290.

The Office on Violence Against Women ("OVW") awarded grants to Minnesota's Fourth Judicial District from 2014 through 2018. *Id.* ¶ 4. The grants' terms "required the [Fourth Judicial District] to implement at a minimum 3–5 Court processes designed to deliver favorable custody and parenting-time litigation results for women alleging domestic abuse." *Id.* ¶ 124. As part of these grants—Kedrowski alleges it was "through" them—the Fourth Judicial District created and maintained the Family Court Enhancement Project. *Id.* ¶¶ 4, 125. The grants' conditions required the Fourth Judicial District to work with OVW's "technical assistance providers" and "a local partner." *Id.* ¶¶ 129, 130. (Defendants filled these roles, but more on that in a bit.) The grants' conditions also required the Fourth Judicial District to "follow specific predefined accuser friendly court procedures." *Id.* ¶ 131. The grants' "'performance measurements' included litigation success for women making allegations of domestic abuse." *Id.* ¶ 132. In other words, "litigation results in the [Fourth Judicial District] became a metric used by OVW for future funding," and the chances of future funding were "increased . . . by delivering unfavorable litigation outcomes for men." *Id.* ¶ 133. The OVW grants "encompassed any type of

[Fourth Judicial District] proceeding from 2015–2018 that involved: (1) domestic abuse; and (2) custody and parenting." *Id.* ¶ 134.   Kedrowski's marital-dissolution proceedings fit both categories. *Id.* ¶ 2; *see also Kedrowski v. Kedrowski*, No. A18-1529, 2019 WL 3000760, at *5 (Minn. Ct. App. July 1, 2019).   An "Internal Court Management Team . . . implemented and administered the [g]rants and their pro-female victim advocacy policies and procedures within the [Fourth Judicial District]." Compl. ¶ 28.

Defendants served various roles in the Fourth Judicial District's procurement, administration, and implementation of the OVW grants.   Elizabeth Richards served as executive director of Violence Free Minnesota during 2014 through 2018 (then known as Minnesota Coalition for Battered Women). *Id.* ¶¶ 15, 43.[2]   She "played an indispensable role" in obtaining the grants. *Id.* ¶ 27.   Richards "participated as a direct voting member of the Internal Court Management Team[.]" *Id.* ¶ 28.   She "developed and conducted pro-female domestic abuse victim advocacy . . . training for [Fourth Judicial District] judges and referees under the [OVW grants], including for the referee in Kedrowski's case." *Id.* ¶ 32.   In a letter to OVW, Richards described Violence Free Minnesota as "an active participant in the Fourth Judicial District Family Court Enhancement Project." *Id.* ¶ 36.

Loretta "Frederick served as an executive of [Battered Women's Justice Project]" from 2014 through 2018. *Id.* ¶ 68.   During that same period, Frederick served as "technical assistan[ce] provider," a role required by the OVW grants that placed Frederick in a "close

---

[2]      All parties stipulated to the dismissal with prejudice of Richards and Violence Free Minnesota.   ECF Nos. 47, 49.   The allegations against Richards and Violence Free Minnesota are described here as background.

collaborative working relationship" with the Fourth Judicial District. *Id.* ¶¶ 54, 55. "Frederick conducted biased [] training—co-led by the referee in Kedrowski's case—where [Fourth Judicial District] judges and referees were forced to [role play] female victims of domestic abuse and then after being forced to say how as a judge or referee they could have helped that victim." *Id.* ¶ 58. Frederick "developed, trained, instilled, and administered . . . the SAFeR decision-making tool[.]" *Id.* ¶ 57. The Fourth Judicial District "required all judges and referees to use SAFeR in custody litigation involving domestic abuse allegations." *Id.* ¶ 183. SAFeR's use was "secretive" and resulted in "parenting-time and custody decisions in favor of women alleging domestic abuse." *Id.* ¶ 178. Frederick was the "main trainer" of the SAFeR model—used by the Referee in Kedrowski's case to "deprive Kedrowski of pretrial parenting time." *Id.* ¶¶ 187, 190.

Aldrich "served in a senior leadership position" with the Center for Court Innovation from 2014 through 2018. *Id.* ¶ 103. Like Frederick, Aldrich served as a technical assistance provider under the OVW grants. *Id.* ¶ 80. "Aldrich worked with the Hennepin County Domestic Abuse Service Center [] to develop and implement a model to steer domestic abuse cases to specific judges and referees." *Id.* ¶ 83. Aldrich's work caused Kedrowski's marital-dissolution case to be reassigned from an "unbiased" judge (who did not participate in the OVW grants) to a referee who participated in the grants and "served on the Internal Court Management Team" with Richards, Frederick, and Aldrich. *Id.* ¶ 84. Aldrich "oversaw the implementation of the policy within the [Fourth Judicial District] to limit the rights of men accused of abuse from litigating." *Id.* ¶ 85; *see also id.* ¶ 86.

5

Kedrowski levels a series of identical allegations against Richards, Frederick, Aldrich, and their organizations. He alleges that OVW would not have awarded grants to the Fourth Judicial District without the participation of Richards, Frederick, and Aldrich. *Id.* ¶¶ 23, 56, 82. All three are alleged to have possessed "power over" Fourth Judicial District matters. *Id.* ¶¶ 24, 53, 79. Richards, Frederick, and Aldrich each "fostered a pro-female domestic abuse victim advocacy culture within the [Fourth Judicial District]." *Id.* ¶¶ 33, 59, 88. Each of them "controlled, trained, coached, and mentored the referee in Kedrowski's case on a nearly daily basis." *Id.* ¶¶ 34, 60, 89. And all three "directly discussed Kedrowski's case with the referee presiding over it and advised the referee to deprive Kedrowski of his fundamental right to parent and to deprive him of his constitutional rights." *Id.* ¶¶ 35, 61, 90. Through their participation on "the Internal Court Management Team," Frederick and Aldrich "forced compliance within the [Fourth Judicial District] to fulfill its [OVW grant] obligation to deliver favorable litigation results to women alleging domestic abuse." *Id.* ¶¶ 63, 91. The board of directors for each of the organization defendants knew of Richards, Frederick, and Aldrich's work in the Fourth Judicial District under the OVW grants, *id.* ¶¶ 47, 70, 105, and knew their "conduct within the [Fourth Judicial District] violated the U.S. Constitution," but failed to supervise or train them to prevent their unconstitutional activities, *id.* ¶¶ 48–49, 74–75, 105–107.

II

A

Relying on the *Rooker-Feldman* doctrine, all Defendants argue that there is not subject-matter jurisdiction over this case and seek dismissal under Rule 12(b)(1). "In the

two decisions for which the doctrine is named, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), the Court established the narrow proposition that with the exception of habeas corpus proceedings, the inferior federal courts lack subject-matter jurisdiction over 'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting review and rejection of those judgments.'"  *In re Athens/Alpha Gas Corp.*, 715 F.3d 230, 234 (8th Cir. 2013) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)).   "This conclusion follows from 28 U.S.C. § 1257, which grants to the Supreme Court exclusive jurisdiction over appeals from state-court judgments."  *Athens/Alpha*, 715 F.3d at 234; *see also Exxon Mobil*, 544 U.S. at 283 ("Federal district courts . . . are empowered to exercise only original, not appellate, jurisdiction.").  In *Exxon Mobil*, the Supreme Court noted that inferior federal courts had sometimes applied the *Rooker-Feldman* doctrine too broadly, "overriding Congress' conferral of federal-court jurisdiction concurrent with jurisdiction exercised by state courts, and superseding the ordinary application of preclusion law pursuant to 28 U.S.C. § 1738," the Full Faith and Credit Act.  *Exxon Mobil*, 544 U.S. at 283.  To check the lower federal courts' enthusiasm for the *Rooker-Feldman* doctrine, the Supreme Court made clear that the doctrine applies only to cases filed in federal court by the losing party in state court "complaining of an injury caused by the state-court judgment" and that "call[] upon the District Court to overturn an injurious state-court judgment."  *Id.* at 291–92.  Importantly, the Court also explained that § 1257 does not "stop a district court from exercising subject-matter jurisdiction simply because a party attempts

to litigate in federal court a matter previously litigated in state court.  If a federal plaintiff 'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . ., then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.'"  *Id.* at 293 (quoting *GASH Assocs. v. Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993)).

As with most legal doctrines, some cases present straightforward *Rooker-Feldman* questions while others are more difficult.  *See Athens/Alpha*, 715 F.3d at 234 (observing that "the scope of the *Rooker-Feldman* doctrine, even as narrowly described in *Exxon Mobil*, is sometimes fuzzy on the margins"); *see also Dodson v. Univ. of Ark. for Med. Sci.*, 601 F.3d 750, 756 (8th Cir. 2010) ("Indirect appeals from state-court judgments have been more controversial[.]") (Melloy, J., concurring).  Examples are instructive.  Consider *Caldwell v. DeWoskin*, 831 F.3d 1005 (8th Cir. 2016).  There, the plaintiff, Caldwell, sued his ex-wife (Lavender) and her attorney (DeWoskin) in a federal district court alleging they had violated the automatic stay by continuing to seek enforcement of a judgment of dissolution against Caldwell, including contempt sanctions, in Missouri state court after Caldwell had filed for bankruptcy.  *Id.* at 1006–08.  The Missouri state court "decided the automatic stay did not prevent it from holding Caldwell in contempt, and so held."  *Id.* at 1007.  The Missouri Court of Appeals later reversed the contempt judgment on grounds other than the automatic stay.  *Id.*  The federal district court entered summary judgment against Caldwell, determining that it lacked subject-matter jurisdiction under the *Rooker-Feldman* doctrine, *id.* at 1008, and the Eighth Circuit reversed, *id.* at 1008–09.  The Eighth Circuit explained: "Whether the doctrine applies depends on whether a federal plaintiff

8

seeks relief from a state court judgment based on an allegedly erroneous decision by a state court—in which case the doctrine would apply—or seeks relief from the allegedly illegal act or omission of an adverse party." *Id.* at 1008 (citing *Hageman v. Barton*, 817 F.3d 611, 615 (8th Cir. 2016)).  Caldwell sought only "compensation for injuries he allege[d] were caused by the actions DeWoskin and Lavender took to enforce the state court's [judgment] after the automatic stay was in place." *Id.* at 1009.  The Eighth Circuit concluded that "Caldwell's claims are not barred by *Rooker-Feldman* because they challenge the actions taken by DeWoskin and Lavender 'in seeking and executing the [state contempt orders],' rather than the state court orders themselves." *Id.*; *see also Hageman v. Barton*, 817 F.3d 611, 614 (8th Cir. 2016) (recognizing that the *Rooker-Feldman* doctrine "is limited in scope and does not bar jurisdiction over actions alleging independent claims arising from conduct in underlying state proceedings"); *Robins v. Ritchie*, 631 F.3d 919, 925 (8th Cir. 2011) (recognizing that *Rooker-Feldman* applies "if the federal claims can succeed only to the extent the state court wrongly decided the issues before it").

*Caldwell* is not unique.  For whatever reasons, and though "[t]he subject of domestic relations . . . is the primary responsibility of the state courts, administering state law, rather than of the federal courts[,]" *Newman v. State of Ind.*, 129 F.3d 937, 939 (7th Cir. 1997), dissatisfied parties to state-court domestic-relations disputes often sue in federal court over their dissatisfaction with the state proceedings.  Defendants cite many examples of such cases in their briefs.  *See* The New York Def's Mem. in Supp. at 18–19 [ECF No. 27]; Frederick and Battered Women's Justice Project Mem. in Supp. at 15–16 [ECF No. 12]; Richards and Violence Free Minnesota's Mem. in Supp. at 14–15 [ECF No. 14].

Regardless, *Caldwell* confirms that a federal district court does not lack subject-matter jurisdiction under *Rooker-Feldman* merely because the federal suit is spawned by, or concerns actions that occurred during, prior state-court domestic-relations litigation. Of particular relevance to such claims and to the claims asserted in this case, the Seventh Circuit has held in a series of persuasive decisions that "[t]he claim that a defendant in a [federal] civil rights suit 'so far succeeded in corrupting the state judicial process as to obtain a favorable judgment' is not barred by the *Rooker-Feldman* doctrine." *Loubser v. Thacker*, 440 F.3d 439, 441 (7th Cir. 2006) (quoting *Nesses v. Shepard*, 68 F.3d 1003, 1005 (7th Cir. 1995)); *see also Newman*, 129 F.3d at 940–41; *Jackson v. Gardner*, 42 F.3d 1391 (7th Cir. 1994) (table); *cf. Dennis v. Sparks*, 449 U.S. 24 (1980). As that court explained in *Nesses*:

> Were [the plaintiff] merely claiming that the decision of the state court was incorrect, even that it denied him some constitutional right, the doctrine would indeed bar his claim. But if he claims, as he does, that people involved in the decision violated some independent right of his, such as the right (if it is a right) to be judged by a tribunal that is uncontaminated by politics, then he can, without being blocked by the *Rooker-Feldman* doctrine, sue to vindicate that right and show as part of his claim for damages that the violation caused the decision to be adverse to him and thus did him harm. Otherwise there would be no federal remedy for a violation of federal rights whenever the violator so far succeeded in corrupting the state judicial process as to obtain a favorable judgment[.]

*Nesses*, 68 F.3d at 1005 (internal citations omitted).

In view of these authorities, the *Rooker-Feldman* doctrine does not bar subject-matter jurisdiction over Kedrowski's case—not all of it, anyway. Kedrowski does not seek

direct review or rejection of the Fourth Judicial District's orders or judgments in his marital-dissolution case. *See* Compl. ¶¶ 236–91. He does not request, for example, an injunction directed at the state court prohibiting enforcement of its orders or a declaration that the state courts' orders are invalid. Rather, he seeks compensatory and punitive damages and attorneys' fees and costs from Defendants. *Id.* at 45. Nor would awarding Kedrowski the relief he seeks indirectly invite or require rejection of the state court's judgments. Though Kedrowski's 47-page, 293-paragraph complaint leaves room for misunderstanding, the core of his claims is that Defendants damaged him by participating in the creation and administration of judicial procedures and rules that were unconstitutionally biased against him. One need not reject state-court judgments to find that biased procedures and rules might damage litigants. To put it another way, it may seem unlikely as a practical matter that Kedrowski would have filed this suit had he entirely prevailed in the state court. But as a legal matter, it is plausible that even a prevailing litigant might suffer harm from biased procedures and rules. To frame the issue in *Caldwell*'s terms, Kedrowski does not "seek[] relief from a state court judgment based on an allegedly erroneous decision by a state court"; he "seeks relief from the allegedly illegal act[s] or omission[s] of" Defendants that, he says, tainted those proceedings. *Caldwell*, 831 F.3d at 1008.[3] That is sufficient for this case to get past *Rooker-Feldman*.

---

[3]     As mentioned, Kedrowski's complaint is sometimes unclear and ambiguous in its description of particular activities that he alleges were unlawful. For example, Kedrowski alleges that Defendants "violated [his] right to a fair and impartial tribunal" but that "[n]othing from the [state court] proceedings themselves is needed to establish" this allegation. Compl. ¶ 248. That seems flawed. How could a fact finder determine that a tribunal was biased without examining the tribunal's proceedings? Also, though the core

B

Aldrich and The New York Fund argue that they are not subject to personal jurisdiction in Minnesota and seek dismissal on this basis under Rule 12(b)(2). "Personal jurisdiction . . . is 'an essential element of the jurisdiction of a district . . . court,' without which the court is 'powerless to proceed to an adjudication.'" *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (quoting *Emp. Reins. Corp. v. Bryant*, 299 U.S. 374, 382 (1937)). "When personal jurisdiction is challenged by a defendant, the plaintiff bears the burden to show that jurisdiction exists." *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014) (citations omitted). "To allege personal jurisdiction, a plaintiff must state sufficient facts in the complaint to support a reasonable inference that the defendant can be subjected to jurisdiction within the state." *Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 474–75 (8th Cir. 2012) (quotations omitted). The plaintiff will not have to prove personal jurisdiction by a preponderance of the evidence "until trial or until the court holds an evidentiary hearing." *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 647 (8th Cir. 2003). "To successfully survive a motion to dismiss challenging personal jurisdiction, a plaintiff must make a prima facie showing of personal jurisdiction over the challenging defendant." *Fastpath*, 760 F.3d at 820 (citations omitted). "But where, as here, the parties submit affidavits to bolster their positions on the

---

of his suit survives *Rooker-Feldman*, some of Kedrowski's specific allegations of harm may cross the *Rooker-Feldman* line. For example, Kedrowski alleges that one harm he suffered was the "deprivation of parenting [time]." *Id.* ¶ 241. If this deprivation resulted only from a state-court order or judgment, then, it seems, *Rooker-Feldman* may bar that claim of injury. *See Newman*, 129 F.3d at 942.

motion, and the district court relies on the evidence, the motion is in substance one for summary judgment." *Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015) (citation omitted).  In this circumstance, a case should not be dismissed for lack of personal jurisdiction "if the evidence, viewed in the light most favorable to [the plaintiff], is sufficient to support a conclusion that the exercise of personal jurisdiction over [the defendant] is proper." *Id.* (citations omitted).

Here, whether there is personal jurisdiction over Aldrich and The New York Fund boils down to determining whether the exercise of personal jurisdiction over them would comport with federal constitutional due process.  This is a federal-question case; there is subject-matter jurisdiction under 28 U.S.C. § 1331.  Kedrowski asserts federal claims under 42 U.S.C. §§ 1983 and 1985(3) for alleged violations of his constitutional rights.  Compl. ¶ 10.  As the Supreme Court has explained:

> "Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons."  *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014).  This is because a federal district court's authority to assert personal jurisdiction in most cases is linked to service of process on a defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located."  Fed. R. Civ. P. 4(k)(1)(A).

*Walden v. Fiore*, 571 U.S. 277, 283 (2014).   In *Walden*, a federal-question case, the Supreme Court looked to Nevada law to determine whether the federal district court (in Nevada) was authorized to exercise personal jurisdiction over a defendant sued under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).  *Walden*, 571 U.S. at 282–83.  The need to consult state law is absent in those situations where the federal statute

at issue directs otherwise (*e.g.*, where the federal statute provides for nationwide service of process). *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016); *see, e.g.*, *In re Fed. Fountain, Inc.*, 165 F.3d 600, 601 (8th Cir. 1999) (en banc) (holding that the authorization of nationwide service of process in "Fed. R. Bank. P.  7004(d) is a constitutional exercise of congressional authority"). Here, Kedrowski asserts claims under federal statutes that do not direct otherwise. All of this means Minnesota law must be consulted to determine whether there is personal jurisdiction over the New York Defendants, but Minnesota's long-arm statute extends the personal jurisdiction of its courts of general jurisdiction as far as federal constitutional due process allows. *Riley v. MoneyMutual, LLC*, 884 N.W.2d 321, 327 (Minn. 2016). The question to be answered, then, is whether exercising personal jurisdiction over Aldrich and The New York Fund is consistent with federal constitutional due process.[4]

---

[4]     In *Walden*, the Supreme Court applied the Due Process Clause of the Fourteenth Amendment, 571 U.S. at 283, and that will be done here, also. If that were incorrect and the Fifth Amendment's Due Process Clause should be applied, it is true that the Supreme Court has "[left] open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court[]" as the Fourteenth Amendment. *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, ___ U.S. ___, ___, 137 S. Ct. 1773, 1784 (2017) (citing *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 102, n.5 (1987)). However, Aldrich and The New York Fund do not argue that the Fifth Amendment imposes standards different from the Fourteenth Amendment, and authorities from our Eighth Circuit Court of Appeals and from district courts within the Eighth Circuit support this understanding or approach. *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1389 n.2 (8th Cir. 1991); *Clearent, LLC v. Cummings*, No. 4:18-cv-01857-SNLJ, 2019 WL 763800, at *2 (E.D. Mo. Feb. 21, 2019); *Motive Care & Supply, Inc. v. Airstream, Inc.*, No. 6:17-CV-06114, 2018 WL 4053908, at *2 (W.D. Ark. July 18, 2018); *C&A Plus, Inc. v. Pride Sols., LLC*, No. Civ. A3-02-118, 2003 WL 25278133, at *1 (D.N.D. Feb. 7, 2003); *Zumbro, Inc. v. Cal. Nat. Prods.*, 861 F. Supp. 773, 777 n.8 (D. Minn. 1994); *see also Honeywell Int'l, Inc. v. Venstar, Inc.*, 287 F.R.D. 478, 480 n.2 (D. Minn. 2012).

Due process requires that each defendant has sufficient "minimum contacts" with the forum state so that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Daimler AG*, 571 U.S. at 126 (citations and internal quotation marks omitted).  This means "actions by the defendant[s]" themselves must "create a substantial connection with the forum [s]tate" and provide "fair warning" to defendants that they may be subject to jurisdiction there.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 475 (1985) (citations and internal quotation marks omitted); *accord*, *e.g.*, *Creative Calling*, 799 F.3d at 980 (stating defendant's contacts must permit it to "reasonably anticipate being haled into court" in the forum state (citation and internal quotation marks omitted)).  The "fair warning" requirement will be met if defendants have "purposefully directed [their] activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp.*, 471 U.S. at 472–73 (citations and internal quotation marks omitted).  Our Eighth Circuit has identified five factors that district courts are to consider in determining whether a defendant has sufficient minimum contacts with the forum state to justify a finding of personal jurisdiction: (1) the nature and quality of contacts with the forum state; (2) the quantity of those contacts; (3) the relationship between the cause of action and the contacts; (4) the state's interest in providing a forum for its residents; and (5) the convenience to the parties. *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010).  The first three factors are of primary importance, whereas the remaining two are secondary.  *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1102 (8th Cir. 1996).  A court must consider these factors in the

aggregate.  *See Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.*, 51 F.3d 1383, 1388 (8th Cir. 1995).

Kedrowski pleads sufficient facts in his complaint to support a reasonable inference that Aldrich and The New York Fund are subject to specific personal jurisdiction within Minnesota.[5]  He alleges that Aldrich served from 2014 through 2018 as a "technical assistance provider" for the Fourth Judicial District, a role required by the OVW grants. Compl. ¶ 80.  In this role, Kedrowski alleges Aldrich "possessed voting power over [Fourth Judicial District] policies and procedures" and "possessed administrative power within the [c]ourt[.]"  *Id.* ¶¶ 78, 79.  As a result, Kedrowski alleges Aldrich had a "close collaborative working relationship[]" with the Fourth Judicial District.  *Id.* ¶ 81.  Kedrowski alleges that Aldrich "controlled, trained, coached, and mentored the referee in Kedrowski's case on a nearly daily basis during Kedrowski's pretrial proceedings" and "directly discussed Kedrowski's case with the referee."  *Id.* ¶¶ 89, 90.  Citing specifically to minutes he obtained from the Fourth Judicial District, Kedrowski alleges that Aldrich "attended in person or by phone" 17 of the 27 meetings of the Internal Court Management Team for which the Fourth Judicial District provided him records and participated in numerous telephone calls with Frederick and others involved in the Internal Court Management Team.  *Id.* ¶¶ 94, 95.  Based on meeting minutes and other documents, Kedrowski identifies

---

[5]      Aldrich and The New York Fund indisputably are not "at home" in Minnesota, meaning they cannot be subject to general personal jurisdiction.  *See Quality Bicycle Prods., Inc. v. BikeBaron, LLC*, No. 12-cv-2397 (RHK/TNL), 2013 WL 3465279, at *3 (D. Minn. July 10, 2013) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

several specific tasks Aldrich performed, including "(1) revising the bench book; (2) developing and publishing a video on how to obtain an [order for protection]; (3) creating a national webinar; and (4) holding a batterer accountability roundtable (co-led with the referee in Kedrowski's case)." *Id.* ¶ 97.  Kedrowski also alleges that Aldrich served on a sub-committee concerning the OVW grants that "held a whole additional extensive set of meetings in which [she] actively participated." *Id.* ¶ 98.  Kedrowski alleges that, when Aldrich engaged in these activities, she "served in a senior leadership position" with The New York Fund, that her actions were "taken on behalf of the organization[,]" and that The New York Fund's board of directors knew of both Aldrich's "extensive role" and the Fund's "extensive involvement" with the Fourth Judicial District. *Id.* ¶¶ 103, 105.  These allegations reasonably permit the inference that Aldrich and The New York Fund had extensive contact with Minnesota occurring over a five-year period involving important matters of judicial process.  And these contacts, Kedrowski alleges, involved activities that "fostered a pro-female domestic abuse victim advocacy culture within the [Fourth Judicial District]" that he claims violated his federal constitutional rights and caused him harm. *Id.* ¶ 88.  That seems enough for Kedrowski to satisfy his pleading burden to allege sufficient facts to support a plausible inference that Aldrich and The New York Fund are subject to specific personal jurisdiction in Minnesota.

In support of their motion, Aldrich and The New York Fund advance essentially two arguments, but neither is enough to justify dismissing either of these Defendants for want of personal jurisdiction.  *First*, Aldrich and the Fund rely on a declaration filed in Kedrowski's first federal suit in which Aldrich testified essentially that the Fund has no

permanent presence in Minnesota and that her physical presence in Minnesota has been more limited than might be inferred from the allegations in Kedrowski's complaint. *See Kedrowski v. Madden*, No. 18-cv-2573 (WMW/SER), ECF No. 83 ("Aldrich Decl."). Regarding the Fund, Aldrich testified that it "is a New York State domestic not-for-profit corporation," "is not registered to do business in Minnesota," has no "office, agent, representative or employee in Minnesota," and has no "bank accounts or property in Minnesota." *Id.* ¶¶ 5–7. Regarding her own circumstances, Aldrich testified that she is a New York resident, "ha[s] never been a resident of Minnesota," and has "[i]n the past four years, . . . visited Minnesota between four and eight times related to [her] work with The Fund." *Id.* ¶¶ 8–10. Aldrich's testimony regarding her and the Fund's lack of any permanent presence in Minnesota seems beside the point. Kedrowski alleges personal jurisdiction based on Aldrich's specific activities in the Fourth Judicial District and the Fund's endorsement of those activities. He does not allege that either Aldrich or the Fund established an enduring legal, financial, or physical presence in Minnesota. It is true that Aldrich's description of her Minnesota visits seems less extensive than what Kedrowski alleges in his complaint. But Aldrich nowhere denies the complaint's more detailed description of her activities, and her account of "visit[ing] Minnesota between four and eight times" is uncertain and vague in comparison to the complaint's allegations. *Second*, Aldrich and the Fund argue that Aldrich's remote work on behalf of the Fund (*i.e.*, telephone conferences, e-mails, etc.) is "not relevant to the personal-jurisdiction inquiry." New York Defendants' Mem. in Supp. at 14. This is not correct. Though telephone and e-mail "communications 'do not themselves establish jurisdiction,' they 'may be used to

support the exercise of personal jurisdiction.'"  *Creative Calling*, 799 F.3d at 980

(quoting *Digi–Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.*, 89 F.3d 519, 523 (8th

Cir. 1996)).[6]

III

Defendants argue that—if there is subject-matter jurisdiction over the case and

personal jurisdiction over Aldrich and The New York Fund—then Kedrowski's complaint

should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief

can be granted.  In reviewing a motion to dismiss for failure to state a claim under Rule

12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw

all reasonable inferences in the plaintiff's favor.  *Gorog v. Best Buy Co.*, 760 F.3d 787, 792

(8th Cir. 2014).  Although the factual allegations need not be detailed, they must be

sufficient to "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007) (citations omitted).  The complaint must "state a claim to relief

that is plausible on its face."  *Id.* at 570.  "A plaintiff's claim is facially plausible where the

plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged."  *Blomker v. Jewell*, 831 F.3d 1051,

1055 (8th Cir. 2016) (quotation omitted).  Allegations establishing "a sheer possibility that

---

[6]      Aldrich and The New York Fund do not address the fourth and fifth factors
identified by the Eighth Circuit: Minnesota's interest in providing a forum for its residents
and the convenience of the parties.  Therefore, there is no basis to conclude at this time that
the exercise of personal jurisdiction over Aldrich and the Fund in Minnesota "would offend
traditional notions of fair play and substantial justice."  *Creative Calling*, 799 F.3d at 981–
82 (quotation omitted).

a defendant has acted unlawfully" are not sufficient.  *Id.* (quotation omitted).  As our Eighth Circuit Court of Appeals explained in *Gregory v. Dillard's, Inc.*:

> [A] plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims . . ., rather than facts that are merely consistent with such a right.  While a plaintiff need not set forth detailed factual allegations of specific facts that describe the evidence to be presented, the complaint must include sufficient factual allegations to provide the grounds on which the claim rests.  A district court, therefore, is not required to divine the litigant's intent and create claims that are not clearly raised, and it need not conjure up unpled allegations to save a complaint.

565 F.3d 464, 473 (8th Cir. 2009) (en banc) (cleaned up).

## A

Defendants argue that Kedrowski's § 1983 claims fail because he has not alleged facts showing plausibly that Defendants acted "under color of" state law.  42 U.S.C. § 1983.  "Only state actors can be held liable under Section 1983."  *Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001).  This same requirement applies to a claim under § 1985(3).  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (holding that, under § 1985(3), "the party charged with the deprivation must be a person who may fairly be said to be a state actor").  "Under [the Supreme] Court's cases, a private entity can qualify as a state actor in a few limited circumstances—including, for example, (i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity."  *Manhattan Cmty. Access Corp. v. Halleck*, ___ U.S. ___, 139 S. Ct. 1921, 1928 (2019) (citations omitted).

Here, Kedrowski seems to argue only that the Fourth Judicial District and Defendants acted jointly. Pl.'s Mem. in Opp'n at 31–33 [ECF No. 36] (citing *Dennis v. Sparks*, 449 U.S. 24 (1980)). In *Dennis*, the Supreme Court reiterated that § 1983's requirement that a defendant have acted "under color of" state law "does not require that the defendant be an officer of the State." 449 U.S. at 27. As the Court explained: "It is enough that he is a willful participant in joint action with the State or its agents. Private persons, jointly engaged with state officials in the challenged action, are acting [] 'under color' of [state] law for purposes of § 1983 actions." *Id.* at 27–28. Following these authorities, our Eighth Circuit Court of Appeals has explained that "[a] private party who willfully participates in joint activity with the State or its agents is considered a state actor." *Youngblood*, 266 F.3d at 855 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)). "In construing that test in terms of the allegations necessary to survive a motion to dismiss," the Eighth Circuit "has held that a plaintiff seeking to hold a private party liable under § 1983 must allege, at the very least, that there was a mutual understanding, or a meeting of the minds, between the private party and the state actor." *Mershon v. Beasley*, 994 F.2d 449, 451 (8th Cir. 1993). The issue in this context is whether a plaintiff alleges "sufficiently specific" facts showing plausibly that "the defendants had directed themselves toward an unconstitutional action by virtue of a mutual understanding" with the state. *Smith v. Bacon*, 699 F.2d 434, 436 (8th Cir. 1983) (quotations omitted); *see also Deck v. Leftridge*, 771 F.2d 1168, 1170 (8th Cir. 1985) ("Allegations that a public defender has conspired with judges to deprive an inmate of federally protected rights may state a

claim under § 1983," but "allegations of a conspiracy must be pleaded with sufficient specificity and factual support to suggest a meeting of the minds.") (quotations omitted)).

Judged against these standards, Kedrowski's allegations are sufficient. He alleges, for example, that Frederick and Aldrich participated on "the Internal Court Management Team" to direct activities within the Fourth Judicial District aimed at "deliver[ing] favorable litigation results to women alleging domestic abuse." Compl. ¶¶ 63, 91. He alleges that Frederick and Aldrich "controlled, trained, coached, and mentored the referee in Kedrowski's case on a nearly daily basis." *Id.* ¶¶ 34, 60, 89. He alleges that all three "directly discussed Kedrowski's case with the referee presiding over it and advised the referee to deprive Kedrowski of his fundamental right to parent and deprive him of his constitutional rights." *Id.* ¶¶ 35, 61, 90. More generally, he alleges that Frederick "developed" and "administered" a "decision-making tool" that judges and referees in the Fourth Judicial District were required to use and that resulted in "parenting-time and custody decisions in favor of women alleging domestic abuse." *Id.* ¶¶ 57, 183, 178. And Aldrich, he alleges, "oversaw the implementation of the policy within the [Fourth Judicial District] to limit the rights of men accused of abuse from litigating." *Id.* ¶ 85; *see also id.* ¶ 86. Finally, Kedrowski alleges that these activities occurred with the knowledge and approval of the organization defendants. *Id.* ¶¶ 47–49, 70, 74–75, 105–107. These types of activities—exercising internal voting power over a court's activities, discussing the proper handling and outcome of a particular case with the assigned judicial officer, implementing judicial decision-making procedures or devices, and implementing court policy—seem comparable to those the Supreme Court and Eighth Circuit have found show

22

joint action between a private party and the state.  *See*, *e.g.*, *Dennis*, 449 U.S. at 186–87; *Smith*, 699 F.2d at 436–37.

Defendants' arguments do not justify a different conclusion.  No Defendant analyzes or responds fairly to the substance of Kedrowski's many allegations.  Frederick and the Battered Women's Justice Project come closest when they argue that some of Kedrowski's allegations—they identify three—provide mere "labels and conclusions." *See* Frederick and Battered Women's Justice Project Mem. in Supp. at 20, 22–23, and Reply Mem. at 4–6.  Arguing that some of Kedrowski's allegations are conclusory does not address the rest of his allegations, and there are many.  Regardless, the three identified allegations—that Frederick "discussed Kedrowski's case with the referee overseeing it," that the assigned referee used the "SAFeR" decision-making tool "to deprive Kedrowski of parenting time," and that "all [D]efendants have publicly stated their goal to use the courts to increase conviction rates of men accused of domestic abuse," Compl. ¶¶ 61, 190, and 115—plead facts, not labels or legal conclusions.  Relying on a case from this District, *Associated Cont. Loggers, Inc. v. U.S. Forest Serv.*, 84 F. Supp. 2d 1029 (D. Minn. 2000), *aff'd*, 10 Fed. App'x 397 (8th Cir. 2001), Frederick and the Battered Women's Justice Project argue essentially that they cannot be considered state actors merely because they "actively advocated for positions they espouse."  Frederick and Battered Women's Justice Project Mem. in Supp. at 19 (quoting *Associated Cont. Loggers*, 84 F. Supp. 2d at 1033). Kedrowski alleges that Defendants did more than merely advocate.  He alleges essentially that Defendants exercised control over Fourth Judicial District procedures, developed rules and methods for resolving child-custody and domestic-abuse matters that favored women,

discussed his case with the assigned referee, and advised the referee to rule against him. Aldrich and The New York Fund argue that their "conduct is not fairly attributable to the State under either the public function exception or the entanglement exception." Aldrich and New York Fund Mem. in Supp. at 23. Kedrowski does not rely on the public function exception. The case Aldrich and the Fund cite to support their position regarding the entanglement exception, *Molnar v. Care House*, 574 F. Supp. 2d 772 (E.D. Mich. 2008), *aff'd* 359 Fed. App'x 623 (6th Cir. 2009), seems not to analyze the joint action test under *Dennis*. *Id.* at 783–86. Regardless, the case does not say anything that might undermine the conclusion that Kedrowski's allegations plausibly show joint action.

B

If they are plausibly alleged to be state actors, then Defendants argue Kedrowski's claims fail on the merits. Kedrowski's complaint identifies eight claims. Five of these claims are asserted under § 1983 against all Defendants: violation of the "right to an independent tribunal," Compl. ¶¶ 236–244 (Count I); violation of the "right to a fair and impartial tribunal," *id.* ¶¶ 245–251 (Count II); violation of "equal rights," *id.* ¶¶ 252–260 (Count III); violation of "procedural due process," *id.* ¶¶ 261–269 (Count IV); and "violation of substantive due process," *id.* ¶¶ 287 – 291 (Count VIII). Kedrowski asserts two § 1983 claims against only the organization Defendants: "failure to train," *id.* ¶¶ 275–280 (Count VI); and "failure to supervise," *id.* ¶¶ 281–286 (Count VII). Finally, Kedrowski asserts a § 1985(3) "constitutional conspiracy" claim against all Defendants, ¶¶ 270–274 (Count V).

Kedrowski does not allege a plausible claim that he was denied procedural due process. Kedrowski alleges essentially that Defendants violated his right to procedural due process under the Fourteenth Amendment by causing the Fourth Judicial District to be biased against him. To prevail on this claim, Kedrowski must allege facts plausibly showing (1) that Defendants deprived him of a liberty or property interest protected by the Fourteenth Amendment, and (2) that he was deprived of that interest without procedures that were constitutionally sufficient. *Jenner v. Nikolas*, 828 F.3d 713, 716 (8th Cir. 2016) (citing *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011)). "A procedural due process claim focuses not on the merits of a deprivation, but on whether the State circumscribed the deprivation with constitutionally adequate procedures." *Parrish v. Mallinger*, 133 F.3d 612, 615 (8th Cir. 1998). "This inquiry examines 'the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law.'" *Id.* (quoting *Zinermon v. Burch*, 494 U.S. 113, 126 (1990)). "Relevant factors include the affected private interest, the risk of an erroneous deprivation, the probable value of additional procedural safeguards, and the government's interest, including burdens that additional safeguards would entail." *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). Accepting that Defendants caused the Fourth Judicial District officers who adjudicated Kedrowski's marital-dissolution case to be biased against him and that Kedrowski was deprived of a protected interest, he does not—and cannot—plausibly allege that the state courts' procedures were constitutionally deficient. Kedrowski's appellate rights, which he has now exercised twice, provided him with a constitutionally adequate procedure to address district-court bias. *See Kedrowski*,

2019 WL 3000760, at **2–3 (reviewing the denial of Kedrowski's motion for a new trial and his motion to remove a judicial officer for alleged bias); *see also Kedrowski v. Kedrowski*, No. A19-1610, 2020 WL 3638787, at **3–8 (Minn. Ct. App. July 6, 2020) (reversing the district court's entry of frivolous-litigant sanctions against Kedrowski). Kedrowski nowhere alleges that Defendants' activities affected the independence, fairness, or impartiality of Minnesota's appellate courts.

Nor does Kedrowski allege a plausible substantive due process claim.  As the Eighth Circuit has explained:

> In addition to its procedural protections, the Due Process Clause protects individual liberties from government action "regardless of the fairness of the procedures used to implement them." *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010) (internal quotation marks omitted).  To state a substantive due process claim against a state official, a plaintiff must demonstrate that a fundamental right was violated and that the official's conduct shocks the conscience. *Folkerts v. City of Waverly*, 707 F.3d 975, 980 (8th Cir. 2013).  Whether conduct shocks the conscience is a question of law.  *Id.* Conscience shocking conduct only includes "the most severe violations of individual rights that result from the brutal and inhumane abuse of official power." *White v. Smith*, 696 F.3d 740, 757–58 (8th Cir. 2012) (quotation marks omitted).  "Only a purpose to cause harm *unrelated to the legitimate object of* the government action in question will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." *Folkerts*, 707 F.3d at 981 (cleaned up).

*Mitchell v. Dakota Cty. Soc. Servs.*, 959 F.3d 887, 898 (8th Cir. 2020).  "The theory of substantive due process is properly reserved for truly egregious and extraordinary cases, and it proscribes certain government actions regardless of the fairness of the procedures used to implement them." *Zakrzewski v. Fox*, 87 F.3d 1011, 1014 (8th Cir. 1996) (cleaned

up).  The Complaint does not allege conscience-shocking conduct.  It challenges the fairness and impartiality of the Fourth Judicial District's procedures in Kedrowski's marital-dissolution case (and some number of other marital-dissolution cases) owing to Defendants' involvement under the OVW grants.  In the section of his brief opposing Defendants' motions, Kedrowski identifies no particular aspect of Defendants' conduct to be conscience shocking.  Pl.'s Mem. in Opp'n at 43.  Nor does Kedrowski argue that conscience-shocking behavior reasonably may be inferred from any particular aspect of the outcome of his marital-dissolution proceedings.[7]

Kedrowski's § 1983 equal protection and § 1985(3) constitutional conspiracy claims fail because Kedrowski has not plausibly alleged that he is in a protected class. Membership in a protected class is an essential element of each claim.  *Nolan v. Thompson*, 521 F.3d 983, 989 (8th Cir. 2008); *Dornheim v. Sholes*, 430 F.3d 919, 924 (8th Cir. 2005). Kedrowski alleges that "[D]efendants, individually and in concert, violated [his] right to equal protection by selecting and implementing policies and procedures intended to do harm to two groups to which Kedrowski belonged: (1) those accused of domestic abuse and (2) men accused of domestic abuse."  Compl. ¶ 254.  The Eighth Circuit has held "that the term 'class' means something more than the group of people who share the common characteristic of being victims of domestic violence."  *Dornheim*, 430 F.3d at 924 (citing

---

[7]     Kedrowski identifies no specific constitutional or other federal right to support his claims for violation of the "right to an independent tribunal," Compl. ¶¶ 236–244 (Count I), or violation of the "right to a fair and impartial tribunal," *id.* ¶¶ 245–251 (Count II). Understanding these claims as asserting due process rights, they fail for the same reasons as Kedrowski's procedural and substantive due process claims.

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267–68 (1993)).  If victims of domestic violence aren't a protected class, then it follows necessarily that persons accused of domestic violence cannot be a protected class, either.

Finally, Kedrowski's failure to train and failure to supervise claims against the organization Defendants fail because he has not alleged facts plausibly showing a violation of a federally protected right or deliberate indifference.

> It is well-established that § 1983 claims based on [Defendants'] failure to train [their] employees require proof that (1) the [Defendants'] training practices [were] inadequate; (2) the [Defendants were] deliberately indifferent to the rights of others in adopting them, such that the failure to train reflects a deliberate or conscious choice by [Defendants]; and (3) an alleged deficiency in the . . . training procedures actually caused the plaintiff's injury.  Plaintiffs must prove that the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [Defendants] can reasonably be said to have been deliberately indifferent to the need.

*B.A.B. v. Bd. of Ed. of St. Louis*, 698 F.3d 1037, 1040 (8th Cir. 2012) (internal quotation marks and quotations omitted).  "'Deliberate indifference' entails a level of culpability equal to the criminal law definition of recklessness."  *Id.* (quotation omitted).  "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (citation omitted).  "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  *Id.*  Similarly, "[a] supervisor may be held individually liable under § 1983 if he directly participates in the constitutional violation or if he fails to train or supervise the subordinate who caused

the violation." *Brockinton v. City of Sherwood*, 503 F.3d 667, 673 (8th Cir. 2007) (citation omitted). "The standard of liability for failure to supervise is 'demonstrated deliberate indifference or tacit authorization of the offensive acts.'" *Id.* (quoting *Wilson v. City of N. Little Rock*, 801 F.2d 316, 322 (8th Cir. 1986)). Here, Kedrowski has yet to identify a constitutional violation or a violation of some other federally protected right. If he had, his Complaint includes no allegations from which deliberate indifference might plausibly be inferred. With respect to these claims, Kedrowski's complaint advances identical allegations against each organization Defendant: that each knew its employee was engaged in unconstitutional conduct, that each failed to train its employee "that their conduct within the [Fourth Judicial District] violated the U.S. Constitution," and that proper training and supervision would have prevented the violations. Compl. ¶¶ 48–50; 74–76; 106–108. These conclusory allegations do not meet the high bar required to show deliberate indifference.[8]

---

[8]     Kedrowski defended his original Complaint and has identified no additional or different allegations that he might add to overcome Defendants' Rule 12(b)(6) challenge. Therefore, Kedrowski will not be given an opportunity to file an amended complaint, and his Complaint will be dismissed with prejudice.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS**

**ORDERED THAT**:

1.    The motion to dismiss filed by Defendants Loretta Frederick and Battered

Women's Justice Project [ECF No. 9] is **GRANTED** under authority of Fed.

R. Civ. P. 12(b)(6).

2.    The motion to dismiss filed by Defendants Elizabeth Richards and Violence

Free Minnesota [ECF No. 11] is **DENIED AS MOOT** because these

Defendants were dismissed previously pursuant to a Stipulation [ECF No.

47] and Order [ECF No. 49].

3.    The motion to dismiss filed by Defendants Liberty Aldrich and The New

York Fund [ECF No. 25] is **GRANTED** under authority of Fed. R. Civ. P.

12(b)(6).

4.    Plaintiff's Complaint is **DISMISSED WITH PREJUDICE**.

### **LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  September 3, 2020          s/ Eric C. Tostrud
                                   Eric C. Tostrud
                                   United States District Court